### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 05 B 25909 |
| | ) | (Jointly Administered) |
| JII LIQUIDATING, INC. f/k/a JERNBERG | ) | Chapter 7 |
| INDUSTRIES, INC.; JSI LIQUIDATING, | ) | |
| INC. f/k/a JERNBERG SALES, INC.; and | ) | |
| IM LIQUIDATING, LLC, f/k/a IRON | ) | |
| MOUNTAIN INDUSTRIES, LLC, | ) | |
| | ) | Judge John H. Squires |
| Debtors. | ) | |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| RICHARD J. MASON, Chapter 7 Trustee, | ) | |
| | ) | Adv. No. 05 A 01874 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HELLER FINANCIAL LEASING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

These matters come before the Court on the cross-motions of plaintiff Richard J.

Mason (the "Trustee") and defendant Heller Financial Leasing, Inc. ("Heller") for summary

judgment pursuant to Federal Rule of Bankruptcy Procedure 7056 and Federal Rule of Civil

Procedure 56 on the Trustee's complaint[1] seeking a declaration as to the nature of three

---

[1] On June 29, 2005, JII Liquidating, Inc., formerly known as Jernberg Industries, Inc., JSI Liquidating, Inc., formerly known as Jernberg Sales, Inc., and IM Liquidating, LLC, formerly known as Iron Mountain Industries, LLC (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (Debtors' Mot. for Order Directing Joint Admin. of Chapter 11 Cases ¶ 1.)  The following day, an order was entered substantively consolidating the cases.  Subsequently, on September 6, 2005, the Debtors filed a three-count complaint against Heller. (Tr.'s Mot. to Substitute for Pl. as Party in Interest & to Change Caption ¶ 2.) Shortly thereafter, on September 26, 2005, the Court entered an order converting the Debtors' cases to cases under Chapter 7 of the Code,

-2-

contractual documents executed by the Debtors and Heller, avoidance of all liens asserted

by Heller on certain equipment, and turnover of all post-petition payments made to Heller

related to that equipment.[2] For the reasons stated herein, the Court finds as a matter of law

that the contractual documents constitute a disguised security agreement rather than a "true

lease" pursuant to 810 ILCS 5/1-201(37). The Court further finds that the Trustee's interest

in the equipment at issue is superior to the portion of Heller's interest that remained

unperfected as of the petition date. Thus, the Trustee may avoid that portion of Heller's lien

on the equipment under 11 U.S.C. § 544(a). Finally, the Court finds that the Trustee may

recover, pursuant to 11 U.S.C. §§ 550 and 551, all payments received post-petition by Heller

in connection with the unperfected lien on the equipment, as well as all future payments due

and owing with respect to the equipment. A separate order will be entered granting the

Trustee's motion on Counts I, II, and III of the amended complaint and denying Heller's

cross-motion on those counts. A status hearing on Count IV is set for May 30, 2006 at 10:00

a.m.

---

effective October 10, 2005. (*Id.* ¶ 3.) On November 21, 2005, the Court granted the
Trustee's motion to substitute for the plaintiff as party in interest and to change the caption
of the case. Thus, the Debtors' interest in this adversary proceeding has now become the
interest of the Trustee.

[2] On February 27, 2006, the Trustee presented the Court with an amended complaint,
identical to the one originally filed but with an additional count. Count IV seeks avoidance
and turnover of $363,693.21 paid to Heller during the ninety days prior to the petition date.
(Am. Compl. ¶¶ 33-44.) (The figure in Count IV ($363,693.21) differs from the amount of
the quarterly payments under the agreement at issue ($363,683.21). The Court attributes this
difference to a scrivener's error.) In an order entered the same day, the Court granted the
Trustee leave to file the amended complaint but noted that the instant cross-motions for
summary judgment shall apply only to Counts I, II, and III.

-3-

# I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain these matters pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. They are core proceedings under 28 U.S.C. § 157(b)(2)(A), (E), (K), and (O).

# II. UNDISPUTED FACTS AND BACKGROUND

The Debtors were collectively one of the country's largest independent providers of high-volume machined and forged parts for the transportation industry. (Debtors' Mot. for Order Authorizing & Approving Sale of Assets & Authorizing Assumption & Assignment of Leases & Contracts ¶ 4.) On December 31, 1998, the Debtors and Heller entered into a "Master Lease Agreement" (the "Agreement"), wherein Heller agreed to "lease" to the Debtors various pieces of equipment, which were to be itemized and described in subsequently executed "Master Lease Schedules." (Am. Compl. ¶ 6 & Ex. A ¶ 1; Tr. 7056-1 statement ¶ 4; Heller 7056-2 statement ¶ 4.) Paragraph 21(g) of the Agreement expressly provided that it was "non-cancelable" and that the Debtors' obligations under the Agreement were "absolute and unconditional." (Am. Compl. Ex. A ¶ 21(g); Tr. 7056-1 statement ¶ 5; Heller 7056-2 statement ¶ 5.) The Agreement also enumerated various "events" that would constitute default under the contract, including the filing of a voluntary petition in bankruptcy. (Am. Compl. Ex. A ¶ 16(d).) According to the Agreement, upon the occurrence of such a default, Heller had the right to terminate or cancel the Agreement and "declare all

-4-

[r]ent . . . immediately due and payable," whereupon the Debtors would be obligated to "promptly pay the same[.]" (*Id.* ¶ 17(iii).)

Subsequent to signing the Agreement, the Debtors and Heller executed twelve Master Lease Schedules numbered 1 through 5 and 7 through 13.[3] (Heller 7056-1 supp. statement ¶¶ 3-14 & Exs. B-M; Tr. 7056-2 statement ¶¶ 3-14.) Under each, the Debtors received and accepted the equipment described in the schedules. (*Id.*) On March 23, 2001, the parties entered into Master Lease Schedule 14 ("Schedule 14"), which covered the equipment listed in Schedule A attached thereto (the "Equipment"). (Am. Compl. ¶ 7 & Ex. B; Tr. 7056-1 statement ¶ 7; Heller 7056-2 statement ¶ 7.) Pursuant to the terms of Schedule 14, the Debtors were required to make quarterly payments of $363,683.21, plus applicable taxes, beginning on April 1, 2001, for a term of twenty quarters, or five years. (Am. Compl. ¶ 9 & Ex. B ¶¶ 6-8; Tr. 7056-1 statement ¶ 8; Heller 7056-2 statement ¶ 8.) According to Schedule 14, the cost of the Equipment was $5,830,996.14. (Am. Compl. ¶ 9 & Ex. B ¶ 2.) The parties do not dispute that the Equipment under Schedule 14 consists precisely of those items listed in Schedules 1 through 5 and in Schedules 7 through 13, "no more and no less." (Heller 7056-1 supp. statement ¶ 15; Tr. 7056-2 statement ¶ 15.)

Executed simultaneously with Schedule 14, a "Purchase Option Rider" (the "Purchase Option") provided that at the end of the five-year term, the Debtors could purchase the Equipment for $1.00 plus any applicable taxes, assuming no breach of the Agreement had occurred and the Debtors provided Heller with timely notice of their intention to exercise the

---

[3] Heller asserts that it has no record of a Master Lease Schedule 6 to the Agreement. (Heller 7056-1 supp. statement ¶ 17.)

-5-

option. (Am. Compl. Ex. C.) In the event that the Debtors did not exercise the Purchase Option, "all of the terms and provisions of the Schedule(s) [would] continue in full force and effect . . . ." (*Id.*)

On December 15, 2001, Heller filed a Uniform Commercial Code ("UCC") financing statement against the Debtors with the Illinois Secretary of State identifying only the equipment under Master Lease Schedule 13 ("Schedule 13"). (Tr. 7056-1 statement ¶ 11 & Ex. E; Heller 7056-2 statement ¶ 11.) A financing statement listing all of the Equipment under Schedule 14 was never filed. (Tr. 7056-1 statement ¶ 13; Heller 7056-2 statement ¶ 13.)

On June 29, 2005, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[4] (Tr. 7056-1 statement ¶ 2; Heller 7056-2 statement ¶ 2.) The following day, they filed a motion for an order authorizing and approving the sale of certain assets free and clear of liens, claims, interests, charges, and encumbrances and authorizing the assumption and assignment of various leases and contracts in connection with the sale (the "Sale Motion"). (Tr. 7056-1 statement ¶ 15; Heller 7056-2 statement ¶ 15.) Attached to the Sale Motion was an Asset Purchase Agreement (the "APA"), executed by the Debtors and Hephaestus Holdings, Inc. ("HHI") on June 29, 2005. (Tr. 7056-1 statement ¶ 16; Heller 7056-2 statement ¶ 16.) Pursuant to the APA, HHI agreed to buy the Debtors' "Purchased Assets," as defined by the contract, including "all machinery, equipment, spare parts, tools, dies, test equipment, furniture, fixtures, . . . and other tangible personal property. . . [.]" (Sale Motion Ex. A §§ 2.1 & 2.2(a); Tr. 7056-1 statement ¶¶ 23 & 24; Heller 7056-2 statement ¶¶

---

[4] An order was entered on June 30, 2005 substantively consolidating the cases.

-6-

23 & 24.)  In addition, the APA provided that HHI would take over certain "Assumed

Liabilities" of the Debtors, including the Agreement at issue.  (Sale Motion Ex. A § 2.1; Tr.

7056-1 statement ¶¶ 19-22; Heller 7056-2 statement ¶¶ 19-22.)  In particular, HHI agreed to

pay all amounts owed to Heller under Schedule 14 as of the petition date, as well as those

amounts due thereafter under the Schedule.  (Am. Compl. ¶ 16; Answer ¶ 16.)

On August 22, 2005, the Official Committee of Unsecured Creditors (the

"Committee") filed an objection to the Sale Motion.  (Am. Compl. ¶ 17; Answer ¶ 17.)

Specifically, the Committee objected to, *inter alia*, HHI paying Heller under Schedule 14,

arguing that neither the Schedule nor the Agreement is a "true lease" and that Heller had not

perfected its security interest in the Equipment as of the petition date.  (*Id.*)

On August 24, 2005, the Court granted the Sale Motion.  (Tr. 7056-1 statement ¶ 17;

Heller 7056-2 statement ¶ 17.)  However, the Court declined to characterize the Agreement

as either a "true lease" or a security agreement.  Rather, the Court included in the order a

reservation provision that reads in part as follows:

> The Buyer [(HHI)] is authorized, pending further Court order, to pay the
> Assumed Liabilities with respect to the Unsecured Capital Leases to the
> lessors [(including Heller)]; provided, however, that the Debtors' estates
> reserve all rights to pursue Avoidance Actions against the lessors under the
> Unsecured Capital Leases, to seek to recharacterize the Unsecured Capital
> Leases as they existed as of the Petition Date, to avoid any alleged liens of
> the lessors of the Unsecured Capital Leases arising in connection with the
> Unsecured Capital Leases, and to preserve all rights under Bankruptcy
> Code section 551 in connection with the Unsecured Capital Leases and any
> litigation in connection therewith . . . .

(Order Granting Sale Motion ¶ 15.)

AO 72A
(Rev. 8/82)

-7-

On September 6, 2005, the Debtors filed a three-count complaint against Heller seeking a determination as to the nature of the Agreement, Schedule 14, and the Purchase Option; avoidance of any liens on the Equipment asserted by Heller; and turnover of all post-petition payments made to Heller related to the Equipment. Subsequently, on December 8, 2005, the Trustee filed the instant motion seeking summary judgment in his favor on Counts I, II, and III of the complaint. Specifically, the Trustee argues that the Agreement–along with Schedule 14 and the Purchase Option–is nothing more than a secured transaction. According to the Trustee, because Heller failed to perfect its security interest in the Equipment as of the petition date, he is entitled to avoid any and all of Heller's unperfected liens on the Equipment pursuant to 11 U.S.C. § 544(a)(1) and to recover all amounts received by Heller since the petition date as well as all future payments made in connection with the unperfected liens on the Equipment pursuant to 11 U.S.C. §§ 550 and 551. On January 17, 2006, Heller filed a cross-motion for summary judgment on Counts I, II, and III of the complaint. Not surprisingly, Heller argues that the documents at issue constitute a "true lease" between Heller and the Debtors.

### III. **APPLICABLE STANDARDS**

In order to prevail on a motion for summary judgment, the movant must meet the statutory criteria set forth in Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Rule 56(c) reads in part:

-8-

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that
> the moving party is entitled to a judgment as a matter of law.

FED. R. CIV. P. 56(c); *see also Estate of Allen v. City of Rockford*, 349 F.3d 1015, 1019 (7th Cir. 2003).

The primary purpose of granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987) (*quoting Wainwright Bank & Trust Co. v. Railroadmen's Fed. Savs. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)). Where the material facts are not in dispute, the sole issue is whether the moving party is entitled to a judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998). On a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (internal quotation omitted).

In 1986, the United States Supreme Court decided a trilogy of cases which encourages the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 322; *Matsushita*, 475 U.S. at 585-86.

-9-

All reasonable inferences drawn from the underlying facts must be viewed in a light most favorable to the party opposing the motion. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). The existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248; *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir. 1994). "[S]ummary judgment is not an appropriate occasion for weighing the evidence; rather, the inquiry is limited to determining if there is a genuine issue for trial." *Lohorn v. Michal*, 913 F.2d 327, 331 (7th Cir. 1990). The Seventh Circuit has noted that trial courts must remain sensitive to fact issues where they are actually demonstrated to warrant denial of summary judgment. *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065-66 (7th Cir. 2000); *Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000).

The "party seeking summary judgment always bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (*citing* FED. R. CIV. P. 56(c)). Once the motion is supported by a prima facie showing that the moving party is entitled to judgment as a matter of law, a party opposing the motion may not rest upon the mere allegations or denials in its pleadings; rather, its response must show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 323; *Matsushita*, 475 U.S. at 587; *Patrick v. Jasper County*, 901 F.2d 561, 565 (7th Cir. 1990).

-10-

The parties have filed cross-motions for summary judgment. Each motion must be ruled on independently and must be denied if there are genuine issues of material fact. *ITT Indus. Credit Co. v. D.S. Am., Inc.*, 674 F. Supp. 1330, 1331 (N.D. Ill. 1987). Cross-motions for summary judgment do not require the Court to decide the case on the motions; the Court can deny both motions if both parties have failed to meet the burden of establishing that no genuine issues of material fact exist and that judgment should be entered in their favor as a matter of law. *Id.*; *Pettibone Corp. v. Ramirez (In re Pettibone Corp.)*, 90 B.R. 918, 922 (Bankr. N.D. Ill. 1988). Thus, on their respective motions, the Trustee and Heller each bear the burden of demonstrating the absence of material factual issues and establishing that they are entitled to judgment as a matter of law. *See Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 294 (7th Cir. 1998). "All inferences are construed in favor of the party against whom the motion under consideration is made." *Solow v. United States (In re Johnson Rehab. Nursing Home, Inc.)*, 239 B.R. 168, 172 (Bankr. N.D. Ill. 1999) *(citing Andersen v. Chrysler Corp.*, 99 F.3d 846, 856 (7th Cir. 1996)).

Summary judgment is particularly appropriate in cases involving the interpretation of contractual documents. *United States v. 4500 Audek Model No. 5601 AM/FM Clock Radios*, 220 F.3d 539, 543 (7th Cir. 2000); *Anstett v. Eagle-Picher Indus., Inc.*, 203 F.3d 501, 503 (7th Cir. 2000); *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). "[S]ummary judgment should be entered only if the pertinent provisions of the contractual documents are unambiguous; it is the lack of ambiguity within the express terms of the contract that forecloses any genuine issues of material fact." *Ryan*, 877 F.2d at 602. "Construing the language of a contract is a question of law appropriate for summary

-11-

judgment, unless the contract is ambiguous." *Reaver v. Rubloff-Sterling, L.P.*, 708 N.E.2d

559, 561 (Ill. App. Ct. 1999); *see also Ford v. Dovenmuehle Mortgage, Inc.*, 651 N.E.2d 751,

754 (Ill. App. Ct. 1995). These points are pertinent to the motions at bar because the parties

executed various contractual documents, including the Agreement, Schedule 14, and the

Purchase Option, all three of which are at issue in this matter. Neither party claims that any

of these documents are unclear or ambiguous.

Local Bankruptcy Rule 7056-1 of the Local Bankruptcy Rules for the United States

Bankruptcy Court for the Northern District of Illinois, which deals with summary judgment

motions, was modeled after LR56.1 of the Local Rules of the United States District Court

for the Northern District of Illinois. Hence, the case law construing LR56.1 and its

predecessor Local Rule 12 applies to Local Bankruptcy Rule 7056-1.

Pursuant to Local Bankruptcy Rule 7056, a motion for summary judgment imposes

special procedural burdens on the parties. Specifically, the Rule requires the moving party

to supplement its motion and supporting memorandum with a statement of undisputed

material facts ("7056-1 statement"). The 7056-1 statement "shall consist of short numbered

paragraphs, including within each paragraph specific references to the affidavits, parts of the

record, and other supporting materials relied upon to support the facts set forth in that

paragraph. Failure to submit such a statement constitutes grounds for denial of the motion."

Local Bankr.R. 7056-1B.

The Trustee filed a 7056-1 statement that fully complies with the Rule. It includes

numbered paragraphs establishing undisputed facts–most of which appear in Section II *supra*

-12-

of the instant Memorandum Opinion–along with specific references to accompanying exhibits.

In stark contrast, Heller's 7056-1 statement is comprised of merely two paragraphs. The first asserts that Heller incorporates therein its 7056-2 statement and refers the Court to paragraphs 1 through 28 of that statement. (Heller 7056-1 statement ¶ 1.) The second paragraph avers that Heller never received notice that the Debtors or any other person or entity acting on their behalf intended to exercise the Purchase Option and references the affidavit of Joseph Catarina ("Catarina") attached as Exhibit A to Heller's response to the Trustee's motion.[5] (Id. ¶ 2.) Catarina is an account manager employed by General Electric Capital Corporation ("GECC") (Catarina Aff. ¶ 1) and has personal knowledge about the issues in this matter (Id. ¶ 2). According to Catarina, GECC is the successor administrator to Heller with respect to certain accounts, including the one covered by the Agreement. (Id. ¶ 3.) Catarina asserts that he is charged with maintaining the contractual documentation in connection with various Heller accounts. (Id. ¶ 4.) He further states that he is familiar with both the Agreement and the Purchase Option. (Id. ¶¶ 5 & 6.) Finally, Catarina avers that GECC has no record of having received any notice from anyone seeking to exercise the Purchase Option or stating an intention to exercise such Purchase Option. (Id. ¶ 7.)

Heller also submitted a 7056-1 "supplemental statement," which includes numbered paragraphs demonstrating uncontested facts with specific references to accompanying

---

[5]   The first line of the "Affidavit of Joseph Catarina" asserts as follows: "Robert Sember, first being duly sworn, on oath states . . . ." The Court is mystified as to why Robert Sember would be making sworn statements in Joseph Catarina's affidavit. Because Heller's 7056-1 statement mentions Catarina and the heading of the affidavit includes his name, the Court surmises that the reference to Robert Sember is a clerical error, albeit a gross one.

-13-

exhibits. Unlike Heller's sparse 7056-1 statement, it is this pleading that strictly complies with the Rule.

The party opposing a summary judgment motion is required by Local Rule 7056-2 to respond ("7056-2 statement") to the movant's 7056-1 statement, paragraph by paragraph, and to set forth any material facts that would require denial of summary judgment, specifically referring to the record for support of each denial of fact. Local Bankr.R. 7056-2. The opposing party is required to respond "to each numbered paragraph in the moving party's statement" and to make "specific references to the affidavits, parts of the record, and other supporting materials relied upon[.]" Local Bankr.R. 7056-2A(2)(a). Most importantly, "[a]ll material facts set forth in the [7056-1] statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Bankr.R. 7056-2B.

In response to the Trustee's 7056-1 statement, Heller filed a 7056-2 statement that fully complies with the Rule. In substance, it admits each numbered paragraph in the Trustee's statement of undisputed facts.[6] As discussed above, however, Heller ostensibly offered this document as both its 7056-1 statement and its 7056-2 statement. In addition to responding to the Trustee's 7056-1 statement, Heller also properly filed a response to the Trustee's "Statement of Additional Facts."

---

[6] Heller expressly denies two of the paragraphs in the Trustee's 7056-1 statement. One denial focuses on the completeness of the Trustee's statement, not its veracity. (*See* Heller 7056-2 statement ¶ 10.) The other denial faults the Trustee for his use of the term "Unperfected Equipment," noting that such a term is "unintelligble" and neither defined nor meaningful. (*See id.* ¶ 12.)

AO 72A
(Rev. 8/82)

-14-

Similarly, the Trustee filed a 7056-2 statement in response to Heller's 7056-1 supplemental statement in complete compliance with the Rule. Although the Trustee failed to file a 7056-2 statement in response to Heller's original, two-paragraph statement of material facts, that statement, as discussed *supra*, merely referred the Court to Heller's 7056-2 response and asserted a fact about notice that is not outcome-determinative.

## IV.  DISCUSSION

### A.    The Nature of the Agreement

The principal issue before the Court is whether the Agreement, Schedule 14, and the Purchase Option are, together, a "true lease" or whether they constitute, in fact, a disguised security agreement.[7]   The characterization of the documents is important because it establishes who ultimately will be paid under the Agreement. If the documents comprise a secured transaction, then HHI bought the Equipment from the Debtors under 11 U.S.C. § 363, and any remaining payments will have to be made by HHI to the Debtors' estates. If, however, the documents constitute a "true lease," then they were assumed by and assigned to HHI under 11 U.S.C. § 365, and HHI must make the remaining payments to GECC, Heller's successor in interest.

True leases usually govern the temporary use of property and require the return of the leased item to the lessor at the end of a specified term. *In re Loop Hosp. P'ship*, 35 B.R.

---

[7]   Paragraph 1 of the Agreement notes that all schedules and riders executed in connection with the Agreement "shall constitute one lease" and that references to the Agreement include all such schedules and riders. (Am. Compl. Ex. A ¶ 1.) The Court will adopt this convention. Thus, in citing the Agreement in this Memorandum Opinion, the Court also refers to Schedule 14 and the Purchase Option unless otherwise noted.

-15-

929, 931 (Bankr. N.D. Ill. 1983). In addition, true leases are subject to the assumption or

rejection provisions of § 365 of the Code. *Id.* That is, a lessee must assume the lease and

then fully perform all of its obligations thereunder; assume the lease and then assign it to a

third party (like HHI) who will assure adequate future performance of the remaining lease

obligations of the lessee; or reject the lease and surrender the property. 11 U.S.C. § 365(a);

*United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 610 (7th Cir. 2005). In

contrast, leases intended as security are subject to either Article 2 (sales) or Article 9 (secured

transactions) of the UCC. *Loop Hosp.*, 35 B.R. at 931. A party that has provided security

typically assumes the obligations and risks associated with the benefits of ownership and may

retain the property after paying the economic value of the security interest. *United Airlines*,

416 F.3d at 610; *Loop Hosp.*, 35 B.R. at 931.

"Similar economic function implies the ability to draft leases that work like security

agreements, and secured loans that work like leases." *United Airlines*, 416 F.3d at 610.

Thus, the problem of distinguishing between a true lease and a security agreement arises

when a contract takes the form of and is denominated as a lease but the substance of the

contract is that of a security agreement. *Loop Hosp.*, 35 B.R. at 931. Indeed, the Official

UCC Comment notes that one of the reasons that the law with respect to leases was codified

was to resolve this issue which "has created considerable confusion in the courts[.]" 810

ILCS 5/1-201(37) cmt. (2004) (noting that "the task of sharpening the line between true

leases and security interests disguised as leases continues to be a function of this section");

*see also* JAMES WHITE & ROBERT SUMMERS, UNIFORM COMMERCIAL CODE § 30-3 (4th ed.

-16-

1995) (observing that the "'lease vs. security interest' issue is one of the most frequently litigated issues under the entire Uniform Commercial Code").

The Bankruptcy Code, itself, does not define the term "lease" as it is used in § 365. However, the Code does define "security agreement" as an "agreement that creates or provides for a security interest" and "security interest" as a "lien created by an agreement." 11 U.S.C. §§ 101(50) & (51). Nevertheless, these definitions offer little guidance in distinguishing between a true lease and a disguised security transaction.

Thus, to determine whether an agreement that contends to be a lease is a true lease or a security agreement, the Court must look to state law. *United Airlines*, 416 F.3d at 614 (explaining that "[b]ecause nothing in the Bankruptcy Code says which economic features of a transaction have what consequences, we turn to state law"); *Powers v. Royce (In re Powers)*, 983 F.2d 88, 90 (7th Cir. 1993) (noting that "the existence, nature and extent of a security interest in property is governed by state law"); *In re Buehne Farms, Inc.*, 321 B.R. 239, 242 (Bankr. S.D. Ill. 2005); *Direct Air, Inc. v. Fairchild Aircraft, Inc. (In re Direct Air, Inc.)*, 189 B.R. 444, 450 (Bankr. N.D. Ill. 1995) (*citing Powers*); *In re Lerch*, 147 B.R. 455, 457 (Bankr. C.D. Ill. 1992); *Rent-A-Center, Inc. v. Spears (In re Spears)*, 146 B.R. 772, 773 (Bankr. S.D. Ill. 1992). Paragraph 21(f) of the Agreement in this matter states that the laws of Illinois shall govern, and the parties do not dispute that Illinois law applies here.

Under Illinois law, Uniform Commercial Code § 1-201(37) controls the determination of whether a contract that purports to be a lease is a true lease or a security agreement. 810 ILCS 5/1-201(37); *Direct Air*, 189 B.R. at 451; *Lerch*, 147 B.R. at 457; *Spears*, 146 B.R. at 773. That section provides in relevant part as follows:

-17-

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee; and

(a)     the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b)     the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(c)     the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d)     *the lessee has an option to become the owner of the goods for* no additional consideration or *nominal additional consideration upon compliance with the lease agreement.*

810 ILCS 5/1-201(37) (emphasis added). Under the bright line, per se test set out in this portion of the statute, a contract will be construed as a security interest as a matter of law if the lessee cannot terminate the agreement and any one of the four specified requirements is satisfied. *United Airlines*, 416 F.3d at 616 (noting that "[t]his is the UCC's *per se* rule"); *Buehne Farms*, 321 B.R. at 242 (stating that "a security agreement is conclusively found to exist" upon satisfaction of the requirements of the statute); *In re Beam*, No. 97-82752, 1998 WL 34065623, at *4 (Bankr. C.D. Ill. July 31, 1998) (applying New York law); *Banterra Bank v. Subway Equip. Leasing Corp. (In re Taylor)*, 209 B.R. 482, 484 (Bankr. S.D. Ill. 1997).

If a court finds as a matter of law that a contract constitutes a security agreement under the per se test, the inquiry is over. *Buehne Farms*, 321 B.R. at 242; *Taylor*, 209 B.R.

-18-

at 484-85; *In re Meeks*, 210 B.R. 1007, 1009-10 (Bankr. S.D. Ill. 1995); *but see Lerch*, 147 B.R. at 460 (finding that satisfaction of the two-prong per se test did not establish that an agreement was a security interest without further analysis of the economics of the transaction and all of the facts of the case). If, however, the court determines that the document does not comprise a security agreement per se, the court must go on to analyze the facts particular to the case to decide whether the "'economics of the transaction' point to such a result." *Buehne Farms*, 321 B.R. at 243; *see also Beam*, 1998 WL 34065623, at *5; *Taylor*, 209 B.R. at 484-85; *Meeks*, 210 B.R. at 1009-11 (turning to the examination of a variety of factors after finding that the contract at issue could not be categorized as a security agreement as a matter of law under the per se test). Indeed, unlike the prior codification of § 1-201(37), which required courts to analyze agreements in light of the parties' intent, the focus is now on the "economic realities of the transaction." *Buehne Farms*, 321 B.R. at 242 (explaining that "the intent of [the] parties is subordinated to the 'economic realities' of the transaction . . . ."); *In re Dena Corp.*, 312 B.R. 162, 169 (Bankr. N.D. Ill. 2004) (noting that "[c]ourts look [to] the economic reality underlying a questioned agreement and not to the labels applied by the parties to determine the true nature of a transaction"); *Taylor*, 209 B.R. at 484 & n.3 (*citing* WHITE & SUMMERS, UNIFORM COMMERCIAL CODE § 30-3(b)); *Meeks*, 210 B.R. at 1009; *Lerch*, 147 B.R. at 458.

Before its amendment in 1992, § 1-201(37) was silent as to which factors, other than the option to purchase, the courts were to consider in characterizing contracts not meeting the per se test. *See In re Marhoefer Packing Co.*, 674 F.2d 1139, 1145 (7th Cir. 1982). Thus, courts analyzed a variety of factors, including the total amount of rent that the lessee was

-19-

required to pay under the lease, whether the lessee acquired any equity or ownership interest

in the property, the useful life of the property, the nature of the lessor's business, and the

payment of taxes, insurance, and other charges ordinarily associated with ownership. *Id.* at

1145; *Dena Corp.*, 312 B.R. at 169-70; *Beam*, 1998 WL 34065623, at *6; *Taylor*, 209 B.R.

at 487; *Spears*, 146 B.R. at 774.

Section 1-201(37) now provides courts with some guidance as to which factors to

consider by setting forth the per se test, discussed above, as well as criteria which, found

alone, would be insufficient proof of a security agreement:

> A transaction does not create a security interest merely because it provides that:
>
> (a)  the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;
>
> (b)  the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;
>
> (c)  the lessee has an option to renew the lease or to become the owner of the goods;
>
> (d)  the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or
>
> (e)  the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

810 ILCS 5/1-201(37).

-20-

Turning to the matter at bar, there is a rebuttable presumption that the Agreement, denominated as a "Master Lease Agreement," is in fact a bona fide lease, absent compelling factors to the contrary. *See Marriott Family Rests., Inc. v. Lunan Family Rests. (In re Lunan Family Rests.)*, 194 B.R. 429, 450-51 (Bankr. N.D. Ill. 1996). Therefore, the Trustee has the burden of proving that the Agreement is not a lease. *See id.* If that presumption is overcome, then the burden shifts to Heller to refute the evidence that the contractual documents constitute a security agreement. *See Buehne Farms*, 321 B.R. at 243.

Examining the Agreement itself, the Court notes that the contract is titled "Master Lease Agreement" and that each schedule is headed "Master Lease Schedule." Moreover, many of the terms used in the documents suggest that together they do, in fact, comprise a bona fide lease. For example, Heller is referred to as the "Lessor"; the Debtors are the "Lessee"; and the quarterly payments to be made are called "rent." (*See* Am. Compl. Ex. A.) However, "[l]abeling an agreement a 'lease' does not necessarily make it one." *Dena Corp.*, 312 B.R. at 169; *see also United Airlines*, 416 F.3d at 612; *Lunan Family Rests.*, 194 B.R. at 450; *Lerch*, 147 B.R. at 458 (observing that "[t]he parties cannot change the legal effect of an instrument simply by giving a name to it"). "It is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transactions." *United Airlines*, 416 F.3d at 612; *see also Marhoefer Packing*, 674 F.2d at 1142 (noting that the drafters of § 1-201(37) refused "to recognize form over substance"); *Direct Air*, 189 B.R. at 450; *Turk v. Wright & Babcock, Ltd.*, 528 N.E.2d 993, 994 (Ill. App. Ct. 1988); *Meeker v. Beeson*, 395 N.E.2d 698, 700 (Ill. App. Ct. 1979) (finding that "in determining the character of an alleged lease . . .[,] the courts will disregard the mere form

-21-

and the words and will endeavor to reach the substance of the agreement" (internal quotation omitted)). Rather, the characterization of an agreement depends on the circumstances of each case. 810 ILCS 5/1-201(37); *Dena Corp.*, 312 B.R. at 169; *Lunan Family Rests.*, 194 B.R. at 450. Where essential components of a sale are demonstrated, the transaction will be characterized as a sale, even though it may have some features of a different type of transfer. *Lerch*, 147 B.R. at 457-58; *Loop Hosp.*, 35 B.R. at 932.

Applying the per se test under § 1-201(37), the Court finds that the contractual documents at issue comprise a disguised security agreement. First, the Agreement was not subject to termination by the Debtors. Paragraph 21(g) of the Agreement itself expressly provided as follows: "This is a non-cancelable Lease and Lessee's [Debtors'] obligations hereunder are absolute and unconditional." Moreover, Schedule 14 provided for quarterly payments of $363,683.21, plus applicable taxes, over a term of twenty quarters. The Debtors could not opt to simply return the Equipment before the end of the term and walk away from the transaction. Finally, the parties themselves do not dispute that the Agreement could not be terminated by the Debtors. (*See* Tr. 7056-1 statement ¶ 5; Heller 7056-2 statement ¶ 5.) Thus, the first prong for finding a security agreement under § 1-201(37) has been established.

For the second prong of the test, any one of the four conditions set forth in subsections (a) through (d) of the statute must be met. Here, the Trustee contends that the fourth subsection has been established. The Court agrees. Under the fourth subsection, a transaction creates a security interest if the lessee has an option to become the owner of the property for no additional consideration or for additional consideration that is nominal. 810 ILCS 5/1-201(37). While the inclusion of a purchase option in an agreement not terminable

-22-

by the lessee does not in and of itself make the agreement one intended for security, where

the lessee can become the owner of the leased property for only nominal consideration at the

expiration of the lease, the transaction is in substance a conditional sale. *Buehne Farms*, 321

B.R. at 244.

> In the matter at bar, the Purchase Option provides in relevant part as follows:

> Notwithstanding any provisions either express or implied to the contrary in
> the Lease or Schedule(s), provided no Event of Default or event which, with
> the giving of notice or lapse of time, or both, would constitute an Event of
> Default, has occurred and is continuing, Lessee, upon written notice received
> by Lessor from Lessee not less than one hundred and eighty (180) days prior
> to the expiration of the initial Term of the Schedule first expiring under the
> Lease, as shown in such Schedule . . . , shall have the right, but not the
> obligation, with respect to all, but not less than all, of the Items of Equipment
> described in the Schedule(s), to purchase all of Lessor's right, title and
> interest, if any, in and to all, but not less than all, such Items of Equipment for
> an amount equal to (a) One and 00/100 Dollar ($1.00), plus (b) any sales, use,
> property or excise taxes on or measured by such sale and any other expenses
> of transfer . . . .

(Am. Compl. Ex. C.) The question, then, is whether the additional consideration required

pursuant to the Purchase Option is nominal under § 1-201(37).

Unfortunately, no "bright line" test exists for determining whether consideration is

nominal. *Buehne Farms*, 321 B.R. at 244; *Taylor*, 209 B.R. at 486. Courts initially defined

"nominal" as a specific dollar amount, such as $1.00, $10.00, or $100.00. *See Beam*, 1998

WL 34065623, at *6. Later, the concept was expanded to a percentage of the value of the

leased property or the total payments required under the agreement. *Id.* Although the case

law widely varies, courts have found that additional consideration of less than 30 percent fits

the requirement of nominal under the statute. *See id.*; *Lerch*, 147 B.R. at 458 (noting that if

the option price "'amounts to 25% or more of the total list price, then the 'lease' is not one

-23-

intended for security'"); *see also Dicap Indus., Inc. v. Starr (In re Starr)*, 113 B.R. 481, 483

(Bankr. S.D. Ill. 1990) (finding that an option to purchase $15,000.00 to $20,000.00 worth

of property at the end of the lease for $500.00 was "clearly a nominal sum in relation to the

value of the property").

In addition to confusion about precise numerical requirements, courts differ as to

which quantities to compare in determining nominality. Some courts compare the option

price to the total rent to be paid or to the original cost of the property under the agreement.

*See Buehne Farms*, 321 B.R. at 245; *Taylor*, 209 B.R. at 486; *see also Orix Credit Alliance,*

*Inc. v. Pappas*, 946 F.2d 1258, 1261 (7th Cir. 1991) (applying New York law). Others

examine the relationship of the option price to the fair market value of the goods at the end

of the term of the agreement. *Beam*, 1998 WL 34065623, at *7; *see also Lerch*, 147 B.R. at

458. Still others, including the Seventh Circuit, favor the comparison of the option price to

the projected value of the property as anticipated by the parties at the option date:

> [I]n determining whether an option price is nominal, the proper figure to
> compare it with is not the actual fair market value of the leased goods at the
> time the option arises, but their fair market value at that time as anticipated
> by the parties when the lease is signed.

*Marhoefer Packing*, 674 F.2d at 1144-45; *see also Orix Credit Alliance*, 946 F.2d at 1262

(*citing Marhoefer Packing*); *Buehne Farms*, 321 B.R. at 245 (*quoting Marhoefer Packing*);

*Taylor*, 209 B.R. at 486 (same).

In attempting to define nominality, § 1-201(37) provides, in pertinent part, that

additional consideration is nominal if "it is less than the lessee's reasonably predictable cost

of performing under the lease agreement if the option is not exercised[.]" 810 ILCS 5/1-

-24-

201(37)(x). This "economic realities" test focuses on whether the lessee has, in light of all of the facts and circumstances, no reasonable alternative but to exercise the option. *Buehne Farms*, 321 B.R. at 245. In other words, "if only a fool would fail to exercise the purchase option, the option price is generally considered nominal and the transaction characterized as a disguised security agreement." *Taylor*, 209 B.R. at 486; *see also Buehne Farms*, 321 B.R. at 245 (*citing Taylor*).

There is no evidence in the record about either the parties' projected value of the Equipment at the end of the Agreement or the amount that the Debtors would have been required to pay for applicable taxes upon execution of the Purchase Option. However, it is difficult to conclude that the one dollar option purchase price, plus the amount for the taxes, is of any real significance in the context of property that originally cost $5,830,996.14. Moreover, by the end of the Agreement term, the Debtors would have paid at least $7,273,664.20 for the use of the Equipment ($363,683.21 per quarter times twenty quarters). After making twenty quarterly payments of $363,683.21, the Debtors would have been foolish to surrender the Equipment if it could have been purchased for a payment of only $1.00 plus taxes. Thus, the Debtors would have had no reasonable alternative but to exercise the Purchase Option. Accordingly, the Court finds that the price under the Purchase Option is nominal within the meaning of § 1-201(37).

Having found that the Debtors could not terminate the Agreement and that the additional consideration required to purchase the Equipment at the end of the term is nominal, the Court concludes that the Agreement is a disguised security sale per se. Given this finding, the inquiry is over, and the Court need not address any of the other factors

-25-

commonly considered in characterizing contracts that have not satisfied the per se test. However, the Court notes the existence of other signposts indicating that the Agreement is a disguised sale.

First, the Agreement itself provides that the parties intended the contract "to be a 'Finance Lease' as defined by Article 2A of the Uniform Commercial Code . . . ." (Am. Compl. Ex. A ¶ 8.)  Moreover, the Debtors were obligated to make "rental" payments totaling $7,273,664.20, while the original cost of the equipment was $5,830,996.14. The fact that the total amount of "rent" was substantially more than the value of the Equipment indicates that a security agreement was intended. *See, e.g.*, *Meeks*, 210 B.R. at 1011 (noting, however, that "this 'test' has been sharply curtailed by the amendments to § 1-201(37)"). In addition, the Debtors were responsible for the maintenance, service, and repair of the Equipment; were required to bear all costs of insurance and loss; and obligated themselves to pay taxes in connection with the Equipment.  (Am. Compl. Ex. A ¶¶ 7, 10, & 13.) Although these costs reflect less "the true character of the transaction than the strength of the parties' respective bargaining positions," *Marhoefer Packing*, 674 F.2d at 1146, they are firm indicia of ownership and do not establish a typical lessor/lessee relationship, *Lunan Family Rests.*, 194 B.R. at 451; *Taylor*, 209 B.R. at 488 (noting that the assignment of costs and risk is "a relevant consideration tending to show that the agreement is not a 'true lease'"). Finally, the Trustee claims that the current fair market value of the Equipment is $4,122,000.00. (Am. Compl. ¶ 22.) This contention suggests that the Equipment's useful life very likely exceeds the term of the Agreement and therefore helps to support the conclusion that the Agreement is a bona fide lease. *See, e.g.*, *Taylor*, 209 B.R. at 488;

-26-

*Spears*, 146 B.R. at 775. However, in its answer, Heller denied the Trustee's allegation as to the Equipment's fair market value and failed to provide an alternate figure or any other evidence in support of its position. (*See* Answer ¶ 22.)

Heller argues that the nature of the Agreement in the context of bankruptcy should not be determined as of the execution date of the contract. Rather, Heller contends, the characterization should be made as of the time immediately prior to the petition date. Heller goes on to argue that because the Debtors defaulted on the Agreement by filing voluntary bankruptcy petitions and because they failed to provide timely notice as to their intention to exercise the Purchase Option, that Purchase Option is no longer valid. According to Heller, the Agreement is, thus, accurately characterized as a true lease. The Court disagrees.

Whether the terms of a contract have been breached has no bearing on the issue of whether the contract is a bona fide lease or a security agreement. Events occurring after the execution of an agreement do not alter the character of the transaction. *Am. President Lines, Ltd. v. Lykes Bros. Steamship Co. (In re Lykes Bros. Steamship Co.)*, 216 B.R. 856, 865 (Bankr. M.D. Fla. 1996). Rather, the characterization of a contract applies *ab initio*, that is, from the beginning of the transaction. *See id.* "Parties make their agreement at the outset. Only there do they have the common intention to create a lease or security agreement, and it is at that time we should determine their true intention." 4 JAMES WHITE & ROBERT SUMMERS, UNIFORM COMMERCIAL CODE § 30-3(b)(1) (5th ed. 2002 & Supp. 2006).

Accordingly, the determination of the true character of the Agreement, Schedule 14, and the Purchase Option is properly made as of the execution of the documents. As discussed at length *supra*, the Court has concluded as a matter of law that the contractual

-27-

documents constitute a security agreement rather than a true lease. The Court finds that the

Trustee has met his burden of proving that the documents comprise a secured transaction and

further finds that Heller has failed to satisfy its burden on refutation. Thus, the Trustee's

motion for summary judgment as to Count I of the complaint is granted, and Heller's cross-

motion with respect to Count I is denied.

**B.    Avoidance of Heller's Lien**

Under Count II of the complaint, the Trustee seeks to avoid, pursuant to 11 U.S.C.

§ 544(a)(1), any lien that Heller may hold on the Equipment under Schedule 14. Section

544(a) vests a trustee with the rights of a hypothetical lien creditor whose lien was perfected

at the time the bankruptcy petition was filed. *In re Wheaton Oaks Office Partners Ltd.

P'ship*, 27 F.3d 1234, 1244 (7th Cir. 1994); *In re Billingsley*, 290 B.R. 345, 347 (Bankr. C.D.

Ill. 2002); *Direct Air*, 189 B.R. at 450. The statute provides in pertinent part as follows:

> (a)    The trustee shall have, as of the commencement of the case, and
> without regard to any knowledge of the trustee or of any creditor, the
> rights and powers of, or may avoid any transfer of property of the
> debtor or any obligation incurred by the debtor that is voidable by--
>
> > (1)    a creditor that extends credit to the debtor at the time of the
> > commencement of the case, and that obtains, at such time and
> > with respect to such credit, a judicial lien on all property on
> > which a creditor on a simple contract could have obtained
> > such a judicial lien, whether or not such a creditor exists[.]

11 U.S.C. § 544(a)(1).

The purpose of § 544(a) is to allow the trustee to marshal or increase the potential

assets of the debtor's estate. *T.M. Sweeney & Sons, LTL Servs., Inc. v. Crawford (In re T.M.

Sweeney & Sons, LTL Servs., Inc.)*, 120 B.R. 101, 106 (Bankr. N.D. Ill. 1990), *rev'd on other

-28-

grounds, *Farm Credit Bank of St. Louis v. Lucas*, 152 B.R. 244 (C.D. Ill. 1993), *rev'd,*

*Appeal of Swartz*, 18 F.3d 413 (7th Cir. 1994). This purpose is accomplished by giving the

trustee the power to avoid those transfers voidable by a judicial lien creditor. *Id.* "As a ...

hypothetical lien creditor, the [t]rustee is deemed to have a lien on all lienable property of

the debtor[.]" *Billingsley*, 290 B.R. at 347. "[T]he [t]rustee's hypothetical lien is inferior

to any existing perfected lien at the time the petition is filed, but it is superior to any

unperfected lien." *Id.*; *see also Software Customizer, Inc. v. Bullet Jet Charter, Inc. (In re*

*Bullet Jet Charter, Inc.)*, 177 B.R. 593, 603 (Bankr. N.D. Ill. 1995) (explaining that transfers

of a debtor's property that are unperfected are not effective against the trustee); *Paramount*

*Int'l, Inc. v. First Midwest Bank, N.A. (In re Paramount Int'l, Inc.)*, 154 B.R. 712, 714

(Bankr. N.D. Ill. 1993) (observing that "improperly perfected security interests in a debtor's

property are vulnerable to the rights of" a trustee); *In re Goode*, 131 B.R. 835, 841 (Bankr.

N.D. Ill. 1991) (stating that § 544(a) cannot be used by a trustee to attack perfected

transactions at the time of filing); *T.M. Sweeney*, 120 B.R. at 106 (finding that "the trustee's

powers are those which state law would allow to a hypothetical creditor of the debtor who,

as of the commencement of the case, had completed the legal or equitable processes for

perfection of a lien upon property available for the satisfaction of his claim against the

debtor").

Bankruptcy courts look to state law to determine interests in property and the

perfection of liens therein. *Butner v. United States*, 440 U.S. 48, 55 (1979). As noted *supra*,

the law of Illinois is controlling in the matter at bar. Section 9-310(a) of Illinois's enactment

-29-

of the UCC provides that, with exceptions not applicable here, "a financing statement must be filed to perfect all security interests. . . ."   810 ILCS 5/9-310(a).

The Trustee acknowledges that Heller may have a security interest in the Equipment at issue.   Indeed, pursuant to the Agreement, the Debtors granted Heller "a first priority continuing lien and security interest in the Equipment . . . ."   (Am. Compl. Ex. A ¶ 21(b).) However, the parties agree that a financing statement listing all of the Equipment under Schedule 14 was never filed.   (Tr. 7056-1 statement ¶ 13; Heller 7056-2 statement ¶ 13.) Given that undisputed fact, the Trustee contends that Heller's security interest in the Equipment is not perfected and, therefore, is subordinate to the one held by the Trustee under the strong-arm powers of § 544.

In response, Heller relies on the financing statement that was timely filed on December 15, 2001, which identified all of the equipment under Schedule 13: "(4) Nishijimax NHC-100 CNC Auto Saw; (4) Loading Magazine 31 ft. Bundle Rack; (4) DMS System; [and] (4) Magnetic Chip Removal[.]"   (Heller 7056-1 supp. statement Ex. M; Tr. Mot. for Summ. J. ¶ 12.)   According to Heller, because these pieces of equipment also are included under Schedule 14 and because a financing statement was properly filed identifying them in connection with Schedule 13, the Trustee's security interest in the Equipment is not superior to Heller's.

In support of its argument, Heller cites *In re Comdisco, Inc.*, 270 B.R. 909, 911 (Bankr. N.D. Ill. 2001), and *In re Reda, Inc.*, 54 B.R. 871, 880 (Bankr. N.D. Ill. 1985), for the proposition that a trustee "cannot reject one obligation under a contract and still enjoy the benefits of that same contract."   (Heller Resp. to Tr. Mot. for Summ J., p. 7.)   More

-30-

specifically, Heller argues that the Trustee is not entitled to assert that a portion of the

Agreement is "executory" and another portion of it is not, "especially when the distinction

is based upon which items of equipment included in Schedule #14 are covered by a validly

perfected security interest." (*Id.*) In *Comdisco*, the Chapter 11 debtor filed a motion to reject

two product orders but failed to move to reject the related agreements. 270 B.R. at 910-11.

The court found that the parties had not expressed an intent that the breach of one product

order executed pursuant to a particular agreement would constitute a breach of that

agreement and other product orders under the agreement. *Id.* at 912. Although *Reda*

involved the priority of secured interests under Article 9 of the UCC, the controversy in that

case focused on the consequences of the lapse of a financing statement. 54 B.R. at 876-77.

The facts and issues in *Comdisco* and *Reda* are completely distinguishable from those

in the matter at bar. Moreover, the proposition for which the cases are cited is inapposite

here. By identifying and isolating those pieces of equipment common to both Schedules 13

and 14, the Trustee is not rejecting or breaching the Agreement. Nor is the Trustee asserting

that one portion of the Agreement is "executory" and another is not. Thus, Heller's reliance

on the cases it cites is misplaced.

For unknown reasons, Heller filed a financing statement covering only those pieces

of Equipment under Schedule 13 and neglected to or forgot to record a financing statement

covering the equipment under Schedule 14. This oversight is fatal to Heller's position. The

purpose of a financing statement is to put third parties on notice that a security interest might

exist in the listed collateral. *Laurel Motors, Inc. v. Airways Transp. Group of Cos.*, 672

N.E.2d 785, 788 (Ill. App. Ct. 1996). Under Illinois's notice filing system for secured

-31-

transactions, "a party seeking to perfect a security interest must provide enough information to alert an interested party of a possible prior security interest." *First Nat'l Bank of Lacon v. Strong*, 663 N.E.2d 432, 434 (Ill. App. Ct. 1996); *see also Magna First Nat'l Bank & Trust Co. v. Bank of Ill.*, 553 N.E.2d 64, 66 (Ill. App. Ct. 1990). In particular, a description of the collateral must reasonably identify the property covered under the financing statement. *Magna First Nat'l Bank*, 553 N.E.2d at 66.

Here, virtually hundreds of items are delineated under Schedule 14. (*See* Am. Compl. Ex. B.) Of these, only sixteen also appear under Schedule 13. (*See* Heller 7056-1 supp. statement Exs. M & N; Tr. Mot. for Summ. J. ¶ 12.) Identifying on the December 15, 2000 financing statement just a fraction of the more than 250 items at issue is inadequate for purposes of perfecting a lien on the Equipment under Schedule 14. The parties agree that the cost of the equipment under Schedule 13 is about 8.69 percent of the total cost of the Equipment under Schedule 14. (Tr. 7056-1 statement ¶ 14; Heller 7056-2 statement ¶ 14.) Thus, 91.31 percent of the cost of the Equipment represents the amount of Heller's unperfected lien.

The Court concludes that the Trustee's interest as a hypothetical lien creditor is superior to that portion of Heller's interest that remained unperfected as of the filing of the bankruptcy petitions. Thus, pursuant to § 544(a)(1), the Trustee may avoid the part of Heller's lien that is unperfected. Accordingly, the Court grants the Trustee's motion for summary judgment and denies Heller's cross-motion with respect to Count II of the complaint.

-32-

## C.   Recovery of All Post-Petition Payments

Finally, pursuant to §§ 550 and 551 of the Code, the Trustee seeks to recover all

payments received by Heller post-petition in connection with the unperfected lien on the

Equipment, as well as all future payments due from HHI with respect to that Equipment.

Section 550(a) provides that, "to the extent that a transfer is avoided under section 544 ... ,

the trustee may recover, for the benefit of the estate, the property transferred, or, if the court

so orders, the value of such property, from . . . the initial transferee of such transfer . . . ."

11 U.S.C. § 550(a). Section 551 provides, in turn, that "[a]ny transfer avoided under section

. . . 544 . . . is preserved for the benefit of the estate . . . ." 11 U.S.C. § 551.

The Court tracked the substance of these sections in its August 24, 2005 order

granting the Debtors' Sale Motion. Specifically, the Court delineated the payments that the

Debtors' estates would be entitled to collect in the event that the Agreement was

recharacterized as a secured sale and any liens claimed by Heller in connection with the

Agreement were avoided:

> [I]n the event the Unsecured Capital Leases as of the Petition Date are
> recharacterized as something other than true leases and in the further event
> that any claimed liens of the lessors in connection with the Unsecured Capital
> Leases are avoided, the Debtors' estates shall be entitled to collect: (a) from
> the lessors all payments made to the lessors by the Buyer as Assumed
> Liabilities; and (b) from the Buyer, all payments (if any) scheduled to be
> made to the lessors from and after the date five (5) business days after receipt
> by the Buyer of notice from the Debtors of the entry of an unstayed order to
> such effect.  In the event that the Debtors' estates are successful in
> recharacterizing the Unsecured Capital Leases and in avoiding any liens
> claimed by the lessors to the Unsecured Capital Leases, (1) the Debtors shall
> have been deemed to have sold all equipment encompassed by the Unsecured
> Capital Leases to the Buyer free and clear of all liens, claims, encumbrances
> and interests of the lessors of the Unsecured Capital Leases and such
> equipment shall be deemed a Purchased Asset under this Order without the

-33-

> need for further order of this Court, and (2) the Buyer shall have no further
> obligation to the lessors and the Buyer's only obligation shall be to make the
> payments of Assumed Liabilities to the Debtors' estates as opposed to the
> lessors . . . .

(Order Granting Sale Motion ¶ 15.) Because the contractual documents in this matter have

been recharacterized as a disguised security agreement and the Trustee's request to avoid the

portion of Heller's lien that is unperfected has been granted, the Court finds that the Trustee

is entitled to recover the payments that he requests pursuant to §§ 550 and 551 and the

Court's order. Accordingly, the Court holds that the Trustee may recover, for the benefit of

the Debtors' estates, all payments received post-petition by Heller with respect to the

unperfected lien on the Equipment, as well as all future payments from HHI relating to the

Equipment. HHI shall have no further obligation to Heller, and its remaining payments

should be made to the Trustee. The Trustee's motion for summary judgment as to Count III

of the amended complaint is granted, and Heller's cross-motion with respect to Count III is

denied.

## V. **CONCLUSION**

For the foregoing reasons, the Court finds as a matter of law that the Agreement,

Schedule 14, and the Purchase Option constitute a disguised security agreement rather than

a "true lease." The Court further finds that the Trustee's interest in the Equipment is superior

to the portion of Heller's interest that remained unperfected as of the petition date. Thus, the

Trustee may avoid that portion of Heller's lien on the Equipment pursuant to § 544(a).

Finally, the Court finds that the Trustee may recover under §§ 550 and 551 all payments

-34-

received post-petition by Heller with respect to the unperfected lien on the Equipment, as well as all future payments from HHI in connection with the Equipment, and directs both Heller and HHI to make such payments to the Trustee for the benefit of the Debtors' estates. Accordingly, the Court grants the Trustee's motion for summary judgment on Counts I, II, and III of the amended complaint. Heller's cross-motion for summary judgment is denied in its entirety. A status hearing on Count IV is set for May 30, 2006 at 10:00 a.m.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

ENTERED:

DATE: _____4/27/6_____

_____
John H. Squires
United States Bankruptcy Judge

cc: See attached Service List